*Decisions will be entered under Rule 50.*

EDGAR S. IDOL AND KATHERINE G. IDOL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
SPEEDWAY TRANSPORTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87888, 87889. Filed June 27, 1962.

*Owen T. Armstrong, Esq., Henry C. Lowenhaupt, Esq.,* and *Richard D. FitzGibbon, Jr., Esq.,* for the petitioners.
*Robert A. Roberts, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 87888 | Edgar S. Idol and Katherine G. Idol | 1956 | $6,130.77 |
|  |  | 1957 | 45,401.80 |
| 87889 | Speedway Transports, Inc. | 1955 | 2,110.17 |
|  |  | 1957 | 10,110.43 |

The issues presented for our decision are the correctness of the respondent's action in determining (1) that payments made by petitioner Speedway Transports, Inc., to petitioner Edgar S. Idol during 1956 and 1957 constitute dividend distributions; (2) that the disposition of certain assets by petitioner Speedway Transports, Inc., to Cassens Transport Company during 1957 resulted in the realization of capital gain; and (3) that petitioner Edgar S. Idol received a dividend distribution in the amount of $40,000 in 1957 in connection with the disposition of 32 shares of Speedway Transports' stock and the acquisition by Cassens Transport Company of certain assets from Speedway Transports, Inc.

Additional issues presented by the pleadings have been disposed of by concession of the parties.

### FINDINGS OF FACT.

All of the stipulated facts are so found.

Petitioner Edgar S. Idol and Katherine G. Idol are husband and wife residing in St. Louis County, Missouri. They filed joint Federal income tax returns for the years 1956 and 1957 with the director of internal revenue at St. Louis, Missouri.

Speedway Transports, Inc., sometimes hereinafter referred to as Speedway or the corporation, is a corporation organized under the laws of the State of Missouri on August 13, 1941, with its principal office located at St. Louis, Missouri. It filed Federal income tax returns for 1955, 1956, and 1957 with the director at St. Louis, Missouri.

Since its incorporation in 1941 and at all times here material, Speedway has been engaged in the business of transporting automobiles in interstate commerce by means of truck carriers, operating under operating rights granted by the Interstate Commerce Commission.

The outstanding stock of Speedway Transports, Inc., was owned by H. M. Florman who had acquired ownership thereof many years prior to 1953. Florman was engaged in the interstate automobile transport business through his ownership and control of at least two corporations, Associated Transports, Inc., and Speedway.

At all times here material the Interstate Commerce Act made it unlawful for any person having control of two or more carriers to acquire control of another carrier through stock ownership or otherwise except with the appoval of the Interstate Commerce Commission. (49 U.S.C. sec. 5(2) (i) and (4) (1958 ed.).)

On or about September 23, 1953, Florman and Idol executed a contract whereby Idol agreed to purchase from Florman all of the capital stock of Speedway for $10,000 plus the net worth of the company as of September 30, 1953, such amount to be determined by audit by certified public accountants. The net worth of Speedway as of September 30, 1953, on November 16, 1953, was determined to be $89,857.65.

The contract executed by Idol and Florman on September 23, 1953, was as follows:

### PURCHASE CONTRACT

THIS AGREEMENT, made and entered into this 23 day of Sept., 1953, by and between H. M. FLORMAN, hereinafter called "Vendor", and EDGAR S. IDOL, hereinafter called "Vendee", WITNESSETH:

1. Vendor hereby sells to Vendee all of the capital stock of SPEEDWAY TRANSPORTS, INC., a Missouri corporation, St. Louis, Missouri, for the sum of $10,000.00 plus an amount equivalent to the net worth of the said company, said net worth to be determined as of September 30, 1953, by an audit of the company's books by Cornell & Company, certified public accountants.

2. Vendee agrees to pay the said purchase price as follows:

    $5,000.00 upon receipt of the audited statement of net worth;
    $5,000.00 on December 20, 1953;
    $9,000.00 on December 20, 1954;
    $9,000.00 on December 20, 1955;
    $9,000.00 on December 20, 1956;
    $9,000.00 on December 20, 1957;
    $9,000.00 on December 20, 1958;
    $9,000.00 on December 20, 1959;
    $9,000.00 on December 20, 1960;
    $9,000.00 on December 20, 1961;
    $9,000.00 on December 20, 1962; and the balance of the total purchase price on December 20, 1963.

All payments agreed to be made shall be evidenced by a collateral installment payment promissory note dated September 30, 1953 and bearing interest at the rate of three percent (3%) per annum.

3. Vendee agrees that no further transfer or bulk sale of the business or assets of SPEEDWAY TRANSPORTS, INC., or of the stock of the company will be made without sixty (60) days prior notice to Vendor and the opportunity to him to repurchase, or require transfer to his nominee, at the same price and upon the same terms as may have been agreed upon for a proposed sale or transfer.

4. In the event of a sale of SPEEDWAY'S business or its stock prior to the expiration of the term of this Purchase Contract, after due notice of said sale or transfer to Vendor under the terms of the preceding paragraph, Vendee's obligations hereunder shall be considered to have been fully discharged by payments to Vendor equivalent to:

(a) The net worth of SPEEDWAY TRANSPORTS, INC. of Missouri, on September 30, 1953, plus seventy-five percent (75%) of the net earnings after taxes of SPEEDWAY TRANSPORTS, INC., to date of resale; or

(b) Seventy-Five percent (75%) of the resale price, whichever is the greater.

5. In the event a sale is arranged and consummated under the provisions of paragraph 4, Vendor shall be entitled to demand and receive total payments equivalent to the greatest sum provided for in paragraph 4, even though such total payments exceed Vendee's total indebtedness under the terms of paragraph 1.

6. In the event of:

(a) Operation of SPEEDWAY'S business at a loss for a period of more than six (6) months, resulting in an accumulated deficit in net earnings from the effective date hereof; or

(b) Failure by Vendee to make payments as they fall due under paragraph 2; or

(c) The death or disability of Vendee;

Vendor may, at his option, require transfer of Vendee's stock to his nominee at a price equivalent to the balance then due Vendor under this Purchase Agreement, plus the sum of any contributions to capital or surplus of SPEEDWAY made by its stockholders subsequent to the date of this agreement, plus twenty-five percent (25%) of any accumulated net profits not theretofore paid out as dividends.

Vendee agrees to furnish Vendor with a financial statement of SPEEDWAY TRANSPORTS, INC. each quarter and to cause an annual audit to be made by a certified public accountant and furnish Vendor with a copy thereof during the term hereof.

7. Vendee warrants that he will not without the written consent of Vendor, prior to completion of this Contract, cause or permit the withdrawal of SPEEDWAY'S corporate assets through excessive salary payments, declaration of dividends, or any other device, to an extent which will unduly impair the value of securities deposited in escrow in accordance with provisions of nine (9) hereof, and in no event will cause or permit payment of executive salaries in excess of $25,000.00 per year or dividends exceeding twenty-five percent (25%) of net earnings after taxes unless and until the terms of this Contract have been fully executed.

8. This agreement shall be binding upon and inure to the benefit of the heirs, successors or assigns of the parties hereto; provided, however, that Vendor shall not voluntarily transfer or assign his interest or any part thereof without written notice to Vendee, and provided further, that Vendee shall not voluntarily assign his rights or interest without the written consent of Vendor or his successor in interest.

9. Fulfillment of the terms of this agreement shall be guaranteed by the deposit in escrow of SPEEDWAY'S stock under the terms of an escrow agreement attached hereto and made a part hereof.

Executed the date and year first above written.

2/13/56
The undersigned agree that this agreement is cancelled by the purchase of the foregoing stock for $112,500.00

[s]  H. M. Florman
[s]  Edgar S. Idol

[s]  H. M. Florman
     H. M. FLORMAN  (*Vendor*)
[s]  Edgar S. Idol
     EDGAR S. IDOL  (*Vendee*)

Attached to the purchase contract executed by Florman and Idol was an escrow agreement which provided:

## ESCROW AGREEMENT

WHEREAS, H. M. FLORMAN, as Vendor, and EDGAR S. IDOL, as Vendee, have executed a contract for the purchase of certain stock, a copy of which is attached hereto, and EDGAR S. IDOL undertakes thereunder to deposit all of said capital stock in escrow as a guaranty of the due performance of said contract:

Now, THEREFORE, this instrument witnesseth that; concurrently with the execution hereof, said EDGAR S. IDOL is depositing into the hands of T. D. DRURY, as escrow depository, Certificates Nos. 8, 9 and 10 of Speedway Transports, Inc., being all of the capital stock issued by said company, to be held and applied as follows:

1. Upon the mutual demand, in writing, at any time, of both parties to the said agreement, such stock shall be delivered as they together direct.

2. Upon notice and demand in writing of either of the parties to said agreement to deliver said stock to him, the escrow depository shall notify the other of said parties by registered mail and unless protest shall be made in writing within thirty (30) days thereafter, said escrow depository shall make delivery as so demanded.

3. It is contemplated that said agreement between the parties will have been fully performed not later than December 20, 1963. Unless otherwise notified in writing, the escrow depository shall thereupon deliver the said stock to EDGAR S. IDOL.

4. Escrow depository agrees to receive from Vendee, payments on the note provided for in the purchase agreement; to credit such payments on said note; transmit said payments to Vendor; to give the Director of Internal Revenue Office of St. Louis, Missouri, written advice as and when said payments are made and to give said Director thirty (30) days written notice before delivery of stock is made, as provided in paragraphs 1, 2 and 3 hereof.

5. In the event of the death, disability or other incapacity of T. D. DRURY, the ST. LOUIS COUNTY NATIONAL BANK is hereby appointed successor escrow depository.

6. The escrow depository, by joining herein, assumes no responsibility other than the safe keeping of the stock and to deliver the escrow stock in accord with the terms hereof, and shall be indemnified against any liability, loss, cost and expense occasioned hereby.

WITNESS Our Hands, this 23rd day of September, 1953.

[s]  H. M. Florman  
[s]  Edgar S. Idol  
        *Depositor*  
[s]  T. D. Drury  
        *Escrow Depository*

Stock certificates representing all of the outstanding stock of Speedway (consisting of 90 shares having a par value of $100 per share) were registered in the name of Edgar S. Idol on October 1, 1953, and were thereupon delivered to T. D. Drury, the escrowee designated in the escrow agreement.

The promissory note referred to in paragraph 2 of the purchase contract executed by Idol and Florman on September 23, 1953, was never delivered to Florman.

Petitioner Edgar S. Idol served as president of Speedway and chairman of its board of directors during the period October 1, 1953, to May 1, 1957. Petitioner Katherine G. Idol served as vice president of Speedway and also was a member of the board of directors for the same period.

On April 16, 1954, H. M. Florman pleaded guilty to attempted evasion of the corporation income taxes of Associated Transports, Inc., and on April 30, 1954, he was sentenced to imprisonment. His sentence, however, was suspended and he was placed on probation for 5 years.

On August 18, 1954, Speedway filed an application with the Interstate Commerce Commission requesting approval of acquisition of certain operating rights held by Automobile Convoy Company (a Missouri corporation) which included the right to transport automobiles between Detroit, Michigan, and points in Missouri and Illinois (hereinafter referred to as the Detroit franchise). On December 2, 1954, the Interstate Commerce Commission approved Speedway's acquisition of the Detroit franchise for the agreed price of $15,000. Speedway completed the purchase of the Detroit franchise from Automobile Convoy Company during January 1955.

The minutes of a meeting of the Speedway board of directors held on November 17, 1954, read, in part, as follows:

A special meeting of the Board of Directors of Speedway Transports, Inc., was held at the office of the company on this 17th day of November 1954, all directors being present and consenting to the holding of said meeting at said time and place.

Mr. Edgar S. Idol presided as Chairman, and H. Grant Barngrove served as Secretary.

The Chairman made a report on company business of the year to date. He noted the operation's loss in excess of approximately $15,000, and the purchase of equipment that reduced cash on hand to less than $14,000.00 as of October 31st. He said it was doubtful that the company would break even during the last two months of the year, but that an increase in production and business could be expected in 1955 and he recommended the purchase of additional trailers to handle the increase, rather than pay exorbitant rental for the use of such equipment.

He reported he has discussed the company's finances with officers of the Mercantile Trust Company and had been assured they would be glad to establish a credit line of $25,000. on six months notes until such time as the company's need for capital could be more accurately determined.

The policy of owned, rather than leased equipment was unanimously approved and carried.

A motion was made, seconded and the following resolution was unanimously adopted:

RESOLVED that the following officer of this company, to-wit: President & Treasurer, Edgar S. Idol is hereby authorized, for and in behalf of this company:

(a) to borrow money, or obtain credit in any form, from Mercantile Trust Company, St. Louis, Missouri, in such sums, for such periods of time, and

upon such terms and conditions as to such officer in his discretion may seem desirable, and to execute and deliver notes, drafts, acceptances, guaranties, or other credit instruments or agreements therefor in form acceptable to said Bank;

(b) to discount with said Bank any bills receivable of this Company upon such terms and conditions as to such officer, in his discretion, may seem desirable;

(c) to apply for and obtain from said Bank letters of credit, of any kind and to execute such applications, agreements, trust receipts, guaranties, indemnities and other undertakings as to such Officer, in his discretion, may seem desirable:

(d) to pledge, assign, and/or deliver, as security for any of the foregoing obligations, stocks, bonds, bills and accounts receivable, mortgages, bills of lading, warehouse receipts, insurance policies, certificates, and any other property of this company, of any kind, with full power to endorse or assign any thereof in the name of this Company, and to execute and deliver any and all instruments necessary or proper in furtherance thereof; and

(e) to withdraw from Bank and give receipts therefor, and to authorize and request Bank to sell and deliver for account of this Company, any of the collateral securities at any time pledged to Bank.

During 1955, 1956, and 1957, Speedway paid more than $200,000 each year for the acquisition of transportation equipment.

In January and February 1956, Speedway, in addition to the Detroit franchise which it operated under contract with Chrysler Corporation, also owned certain operating rights to transport automobiles between Kenosha, Wisconsin, and certain points in Illinois and Missouri which it operated under contract with American Motors Corporation.

In the latter part of 1955 or January 1956, Cassens Transport Company of Edwardsville, Illinois, sometimes hereinafter referred to as Cassens, which also was engaged in interstate transportation of automobiles, expressed a desire to acquire the Detroit franchise from Speedway and began negotiations therefor with Idol.

On February 13, 1956, the following letter was addressed to T. D. Drury, the escrowee holding the Speedway stock:

Regarding the Stock Purchase Agreement between the undersigned, dated September 23, 1953, you are herewith advised that Edgar S. Idol, one of the undersigned, has purchased all the issued and outstanding stock of Speedway Transports, Inc. (90 shares), as of this date, for $112,500.00. You are herewith directed to deliver said shares of stock to Edgar S. Idol upon his delivery to you of a check of $112,500.00 within 30 days from date hereof.

The parties agree that the payment of above sum constitutes complete satisfaction of all obligations between the undersigned.

Very truly yours,

[s] H. M. Florman
[s] Edgar S. Idol
[s] S. J. Cento

The minutes of a special meeting of the board of directors of Speedway Transports, Inc., held February 23, 1956, read as follows:

A special meeting of the Board of Directors of Speedway Transports, Inc., was held in the offices of the Company in St. Louis at 2 p.m. February 23, all directors being present and waiving notice of the meeting.

Edgar S. Idol acted as Chairman and E. N. Regan as Secretary of the meeting.

The Chairman reported to the Board that he had, on September 23, 1953 entered into a contract for the purchase of all the Company's stock on terms which were not wholly satisfactory either to him or the vendor. He said that on February 13, 1956 he had agreed to complete the deal by paying a flat price of $112,500. In order for him to finance the acquisition at this price, he stated it would be necessary to find another buyer for a portion of the stock or the corporate assets and that, after negotiations extending over several months, he had arrived at an agreement with Cassens Transport Co., to acquire the Detroit operating rights and a limited amount of equipment.

He said that careful consideration had been given to the best method of effectuating these transactions and that particular thought had been given to a complete liquidation of the company, purchase of its Kenosha operating rights and equipment by Idol, and the Detroit rights and equipment by Cassens. This procedure was discarded because of the expense and delay involved in transferring title to the Company's assets, particularly motor equipment and operating rights; and also because of the refusal of the vendor of the stock to bind himself to any final agreement which would be dependent upon approval of the Interstate Commerce Commission.

He stated that it would, in any event, be necessary for the Company either to dispose of the Detroit operation, abandon it entirely or at least eliminate solicitation and Detroit terminal expense. He presented a statement covering operating results of the Detroit franchise which showed losses of $11,965 for 1955 and $1,872 for January 1956, without allocation of any general office overhead.

When the Detroit franchise was acquired in January 1955, it was recognized that very substantial expense would be incurred in building up volume to a point where the business would show a profit. That expense was absorbed without difficulty under the good business conditions of 1955, but with poorer outlook for 1956, retrenchment is essential.

The Chairman stated that after careful consideration of all of these factors he proposed to purchase 42 shares of stock personally, with the understanding that the Company would borrow $60,000 at 5½% interest, payable $1,000 monthly over five years, and purchase for Treasury account, 48 shares of the Company's common stock at $1250 per share; and with the further understanding that the Company will authorize execution of an agreement to exchange its Detroit rights and 13 transport trailers for 36 shares of stock to be acquired by Cassens from Idol after approval of Interstate Commerce Commission is secured.

Upon motion duly made and seconded, the President was authorized and directed to execute the Company's note for $60,000 at 5½% interest, payable monthly to himself at $1,000 per month, and to use the proceeds of the said note for the purchase of 48 shares of the Company's common stock at the price of $1250 per share, the stock to be retained in the Company's treasury.

On motion duly made and seconded, the following resolutions were unanimously adopted:

RESOLVED:

1. That Edgar S. Idol, President, be and he hereby is authorized and directed to enter into an agreement on behalf of this Corporation providing for acquisition by Cassen's Transport Company, Edwardsville, Illinois, of this Company's Detroit franchise and equipment in exchange for 36 shares of this Company's common stock; and

2. That Edgar S. Idol, President, be further authorized and directed to execute and file with the Interstate Commerce Commission any applications and supporting data required for the consummation of these transactions.

Whereupon the meeting was adjourned.

[s]   Edgar S. Idol
*Chairman*

On February 28, 1956, Security Credit Company, an Illinois corporation, controlled by the owners of the stock of Cassens Transport Company, loaned Idol $112,500 on his promissory note. The note provided for the payment of interest at the rate of 5½ percent per annum, payable monthly, and the payment of principal as follows:

$47,500 on Dec. 31, 1957
$5,000 on Dec. 31, 1960
$60,000 in 60 monthly installments of $1,000 plus interest beginning Apr. 1, 1956.

Idol deposited the proceeds of this loan from Security Credit Company in his personal bank account at the Mercantile Trust Company, St. Louis, Missouri. On February 29, 1956, he drew a check payable to Speedway in the amount of $60,000 and deposited it in Speedway's account. On February 29, 1956, Speedway in turn issued a check payable to H. M. Florman in the amount of $60,000.

On February 29, 1956, Idol issued a check payable to Florman in the amount of $52,500.

On March 1, 1956, Speedway issued to Idol the following instrument:

We, SPEEDWAY TRANSPORTS, INC., promise to pay to Edgar S. Idol for value received the amount of $60,000.00 payable in sixty (60) equal monthly installments at an interest rate of 5½% per annum based on unpaid principal. Payment is to commence on April 1, 1956.

The corporation entered an account on its books as of February 28, 1956, indicating its liability to Idol in the amount of $60,000.

On February 28, 1956, 48 shares of Speedway's stock were transferred by Florman to Speedway to be held in treasury. Forty-two shares of its stock were issued by Florman to Idol on the same day. He deposited a stock certificate representing his 42 shares of Speedway stock with Security Credit Company as collateral for the loan to him in the amount of $112,500. He also executed and delivered to Security a document entitled "Collateral Agreement" to which was attached a stock assignment of the 42 shares of Speedway stock.

On February 28, 1956, the following document was executed by Idol, Cassens Transport Company, and Speedway Transports, Inc.:

### PURCHASE AGREEMENT

Cassens Transport Company, an Illinois corporation of Edwardsville, Illinois, hereinafter called Cassens, Speedway Transports, Inc., a Missouri corporation of 3548 S. Grand, St. Louis 18 Missouri, hereinafter called Speedway, and

Edgar S. Idol of 3548 S. Grand St., St. Louis, Missouri, mutually covenant and agree:

1. That Idol will sell and Cassens will purchase 36 shares of Speedway's capital stock, for the sum of $45,000.00 in cash, within 10 days following approval by the Interstate Commerce Commission of an application to be filed seeking authority to exchange said stock for operating rights and equipment of Speedway.

2. That Idol and Cassens will, immediately following the said purchase, arrange for special meetings of the stock holders and board of directors of Speedway and vote their stock in favor of a partial liquidation of Speedway under which the 36 shares of stock purchased by Cassens will be exchanged for:

(a) That portion of Speedway's operating authority under certificate of Public Convenience and Necessity No. MC–106282, issued by the Interstate Commerce Commission, reading as follows:

"New automobiles, new trucks, new bodies and automobile parts, restricted to initial movements, in truckaway and driveaway service, from places of manufacture and assembly in Detroit, Michigan, to points and places in Illinois and Missouri, except Chicago, Illinois."

(b) The equipment listed in Schedule A, attached hereto and made a part hereof.

3. That Cassens shall not, except as indicated in paragraph 2, exercise any control over Speedway, be represented on its board, or take any part in its management.

4. That Cassens shall assume no obligations or liabilities arising from operations of Speedway prior to the date of exchange and that Speedway shall acknowledge and be responsible for any such obligations or liabilities.

5. That this agreement has been considered and approved by the Board of Directors of Cassens and Speedway, and that their respective presidents have been authorized and directed to take whatever steps are required to consummate the transaction.

Executed at St. Louis, Mo., this 28 day of February 1956.

Speedway and Cassens Transport Company filed an application with the Interstate Commerce Commission on March 26, 1956, requesting approval of the purchase by Cassens Transport Company of the Detroit franchise. The Interstate Commerce Commission issued its report on March 21, 1957, approving the acquisition of the Detroit franchise by Cassens Transport Company but reducing the scope of the franchise and limiting the operating rights requested. This report states, in part, as follows:

Vendee would purchase the above-described operating rights of vendor and 13 trailers used in the operation exchanging therefor 36 shares of vendor's stock which it would purchase simultaneously from vendor's sole stock holder for $45,000. The foregoing method of effecting the sale was devised because of tax considerations and it is not intended that vendee at any time will acquire control of vendor as a result of the temporary stock ownership. Our consideration herein is on that basis, and vendee should not purchase the 36 shares of vendor's stock from Idol unless it intends to immediately relinquish them to vendor in payment for the properties covered by the instant purchase.

Because of the cancellation by the Interstate Commerce Commission of a portion of the Detroit franchise, Idol and Cassens Transport

Company adjusted the terms of their agreement on February 28, 1956, reducing the number of Speedway shares to be acquired by Cassens from 36 to 32 and adjusting the cash consideration payable to Idol from $45,000 to $40,000.

On May 1, 1957, 32 shares of Speedway stock were transferred by Idol on the books of the corporation to Cassens Transport Company for which he received $40,000. The 32 shares transferred by Idol to Cassens were released by Security Credit Company as collateral securing payment of the loan to Idol, and he used the $40,000 received from Cassens to make a partial payment on his indebtedness to Security Credit Company. Speedway conveyed title to 15 transport carriers and the Detroit franchise to Cassens Transport Company on May 1, 1957. On the same day Cassens transferred 32 shares of Speedway stock to Speedway which were canceled and a new certificate for 32 shares of Speedway stock was issued to the corporation and held by it in treasury. A bill of sale executed by Speedway and delivered to Cassens on May 1, 1957, recited the receipt from Cassens of 32 shares of Speedway stock "in exchange for" the Detroit franchise valued at $10,000 and 15 listed pieces of equipment assigned a total value of $30,000.

The stock certificate book of Speedway Transports, Inc., for the period October 1, 1953, to May 2, 1957, discloses the following entries:

| Certificate No. | Number of shares | Date certificate issued | Issued to | Date certificate canceled |
|---|---|---|---|---|
| 8 | 46 | Oct. 1, 1953 | Idol | Feb. 29, 1956 |
| 9 | 22 | Oct. 1, 1953 | Idol | Feb. 29, 1956 |
| 10 | 22 | Oct. 1, 1953 | Idol | Feb. 29, 1956 |
| [1] 11 | 48 | Feb. 28, 1956 | Speedway | |
| [1] 12 | 42 | Feb. 28, 1956 | Idol | May 1, 1957 |
| [2] 13 | 32 | May 1, 1957 | Cassens | May 1, 1957 |
| [2] 14 | 10 | May 1, 1957 | Idol | |
| [3] 15 | 32 | May 1, 1957 | Speedway | |

[1] Certificates numbered 11 and 12 were issued in replacement of canceled certificates numbered 8, 9, and 10.
[2] Certificates numbered 13 and 14 were issued in replacement of canceled certificate numbered 12.
[3] Certificate numbered 15 was issued in replacement of canceled certificate numbered 13.

During 1956 and 1957 Speedway made payments in the amounts of $10,575.66 ($8,000 principal and $2,575.66 interest) and $30,756.08 ($28,790.49 principal and $1,965.59 interest), respectively, which were treated on its books as payments of principal and interest on its note payable account. Some of these payments were made directly to Idol and others were made by Speedway to Security Credit Company on behalf of Idol and were credited to his outstanding loan.

The 15 transport carriers transferred by Speedway to Cassens Transport Company on May 1, 1957, had a total net book value on Speedway's books as of that date of $1,857.09 and of $7,529 as of February 29, 1956.

During 1956 and 1957 Speedway had available earnings and profits sufficient to pay dividends in the amounts of $10,575.66 and $30,756.08, respectively.

On its income tax returns for 1956 and 1957 Speedway deducted $2,575.66 and $1,965.59, respectively, the amounts paid to Idol or Security Credit Company on his behalf as interest. The corpora- tion's 1956 return disclosed a deficit of $28,542.16 which it claimed by application for tentative carryback adjustment as a net operating loss carryback to 1955.

The respondent disallowed the foregoing interest deductions claimed by Speedway and determined that the total payments made by the corporation to Idol or on his behalf during 1956 and 1957 con- stituted dividend distributions.

The respondent further determined that Speedway Transports, Inc., realized long-term capital gain in the amount of $23,142.91 re- sulting from its disposition (as a sale) of assets to Cassens Transport in 1957 and that the $40,000 received by Idol from Cassens on May 1, 1957, constituted a dividend distribution to him by Speedway.

### ULTIMATE FINDINGS.

The payments made by Speedway to Idol or on his behalf during 1956 and 1957 constituted dividend distributions.

The two transactions completed on May 1, 1957, constituted a sale of assets by Speedway to Cassens, followed by a dividend distribution to Idol.

### Issue 1. Dividend Distribution.

### OPINION.

The respondent has taken the position that payments made by Speedway Transports, Inc., to Edgar S. Idol (or on his behalf) dur- ing 1956 and 1957 in the amounts of $10,575.66 and $30,756.08, re- spectively, constituted distributions essentially equivalent to divi- dends within the meaning of section 302(b)(1) of the Internal Revenue Code of 1954.[1] The petitioners contend that the foregoing amounts represent payments of principal and interest made by Speed- way under the terms of a loan from Idol and a promissory note exe- cuted on March 1, 1956. The respondent claims that petitioner Edgar S. Idol acquired all of the outstanding capital stock of Speed- way on September 23, 1953, and that the payments made by Speedway

[1] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemp- tion shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

during 1956 and 1957 were actually made for the purpose of partially discharging Idol's personal obligation in the amount of $112,500. Having thus characterized the transaction, the respondent contends that the payments made by Speedway in 1956 and 1957 totaling $41,331.74 constitute constructive dividend distributions to Idol.

As we understand the purchase contract and attached escrow agreement executed by H. M. Florman and Edgar S. Idol on September 23, 1953, the parties contemplated that Idol would become the immediate owner of the 90 outstanding shares of Speedway stock. The first paragraph of the stock purchase contract states that the "Vendor hereby sells to Vendee all of the capital stock of SPEEDWAY TRANSPORTS, INC." Paragraph 4 of this agreement provides that "In the event of a sale of SPEEDWAY's business or its stock prior to the expiration of the term of this Purchase Contract" thus recognizing Idol's right to sell the stock prior to the discharge of his liability to Florman. Immediately after the delivery of the Speedway shares to the escrow agent and their registration in Idol's name on October 1, 1953, he assumed complete management and control of the corporation and inasmuch as he caused the election of new officers and directors of Speedway, he apparently exercised stock voting rights. Consequently we are of the opinion that Idol acquired ownership of the Speedway stock not later than October 1, 1953.

If Idol was not in fact the beneficial owner of the Speedway shares prior to 1956, he has failed to introduce evidence to this effect. The extent of Idol's investment in the Speedway stock is not indicated by the record. In view of the fact that the parties apparently modified the stock purchase contract executed September 23, 1953, and on or about February 13, 1956, altered the consideration from $99,857.65, payable over a 10-year period, to a cash payment of $112,500, it would appear that Idol failed to make all the payments called for by the earlier agreement, but he has not shown that prior to 1956 he did not make some investment in the shares acquired in 1953.

On February 28, 1956, Idol borrowed $112,500 from Security Credit Company and delivered to the company his promissory note in that amount. On February 29, 1956, Idol issued to Speedway a check in the amount of $60,000. On the same day Speedway issued a check payable to Florman in the amount of $60,000 on account of Idol's $112,500 cash obligation to Florman. On March 1, 1956, Speedway executed an instrument in the form of a promissory note in the amount of $60,000, payable in 60 equal monthly installments at 5½-percent interest per annum, and delivered it to Idol. Speedway entered on its books, as of February 28, 1956, an account indicating a liability to Idol in the amount of $60,000.

Petitioners emphasize the fact that the transaction in question was cast in the form of a loan and that the instrument executed by Speed-

way and delivered to Idol on March 1, 1956, is evidence of an actual corporate indebtedness to him. It is true that the instrument delivered by Speedway to Idol on March 1, 1956, does not appear to possess any of the attributes of capital stock. It is drawn for a fixed face amount and calls for fixed monthly payments in the amount of $1,000 plus the payment of interest at the rate of 5½ percent. The collectibility of this instrument is not dependent upon the earnings of Speedway or upon any other contingency. It is also true that the ratio of the corporation's equity capital to its indebtedness (assuming that the $60,000 received from Idol constitutes an actual debt) was less than 4 to 1 as of February 29, 1956, indicating that Speedway was adequately capitalized.[2] Further, Speedway apparently has not been delinquent in making the payments called for by the instrument in question since the record discloses that the corporation made payments to Idol of $10,575.66 in 1956 and $30,756.08 in 1957, the amounts here in issue.

Nevertheless, despite the foregoing evidence of indebtedness, we are of the opinion that the transaction in question was wholly lacking in substance. The sole purpose of the transaction initiated by Idol was the satisfaction of his personal obligation to Florman. When he issued a check for $60,000 to Speedway and caused it to pay that amount to Florman, he simply made the corporation his agent for payment and utilized it as a conduit for the discharge of his personal liability to Florman for the Speedway stock. Speedway's liability to Idol consisted of an obligation to issue a $60,000 check to Florman and, when this payment was made, its liability to him was completely discharged. The release from escrow of the 48 shares of Speedway stock and the delivery thereof to the corporation to be held in treasury was a neutral act so far as the question before us is concerned. Idol was the sole stockholder of Speedway. No corporate purpose was served by the reacquisition by Speedway of 48 shares of its stock from its sole stockholder. Therefore, although the parties have cast the transaction in the form of a loan, we are convinced from this record that no actual borrowing of funds by Speedway from Idol took place. The corporation does not appear to have had any need or business use for the $60,000 received from Idol on February 29, 1956. Since the only purpose of the transaction in question was the discharge of Idol's personal obligation to Florman, we are of the opinion that the question presented here is controlled by the principle enunciated in several decisions which have held that, where a taxpayer contracted to purchase stock and subsequently caused the corporation to satisfy his obligation to the seller of the stock by redeeming the shares he was obli-

[2] The corporation's outstanding liabilities (including $60,000 received from Idol) as of February 29, 1956, totaled $207,486. The balance sheets of Speedway as of that date disclose the equity of the corporation to amount to $54,828.

gated to buy, or by otherwise discharging his liability, he received a taxable dividend. *Wall* v. *United States*, 164 F. 2d 462; *Woodworth* v. *Commissioner*, 218 F. 2d 719, affirming a Memorandum Opinion of this Court; *Zipp* v. *Commissioner*, 259 F. 2d 119, affirming 28 T.C. 314; *Ferro* v. *Commissioner*, 242 F. 2d 838, affirming a Memorandum Opinion of this Court; *George M. Hancock*, 18 T.C. 210; and *Thomas J. French*, 26 T.C. 263.

Although factually these decisions are not squarely in point here, we nevertheless are of the opinion that the nature of the transaction in question is essentially a device arranged for the purpose of distributing the profits of Speedway to reimburse Idol for the payment of his personal debt to Florman and falls within the purview of the principle enunciated in the above-cited cases. Alternatively, the payments here involved also realistically may be regarded as having been made for the purpose of partially discharging Idol's personal obligation to Security Credit Company in the amount of $112,500. In either case, such payments would constitute taxable income to Idol. *Douglas* v. *Willcuts*, 296 U.S. 1. Inasmuch as the payments totaling $41,331.74 made by Speedway to Idol during 1956 and 1957 were not made for any corporate purpose nor pursuant to any genuine indebtedness between the parties, we hold that these distributions to Idol are essentially equivalent to the distribution of a dividend, as the respondent has determined. We further hold that Speedway is not entitled to deduct the portion of the payments made to Idol designated as "interest" during 1956 and 1957.

*Issues 2 and 3. Sale of Assets and Dividend Distribution.*

OPINION.

Petitioners claim that the $40,000 payment made to Idol by Cassens Transport Company on May 1, 1957, represents consideration received for the sale by him to Cassens of 32 shares of Speedway stock. They further contend that the transfer on the same day (May 1, 1957) by Cassens Transport Company of the 32 shares of Speedway stock to Speedway and the simultaneous transfer by the corporation to Cassens of 15 pieces of equipment and ownership of the Detroit franchise constitutes a "complete redemption of all of the stock of the corporation owned by the shareholder" within the meaning of section 302(b)(3) of the 1954 Code.[3]

---

[3] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

\* \* \* \* \* \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

The respondent has taken the position that although these two transactions were cast in the form of a sale of stock by Idol to Cassens Transport followed immediately by a redemption of those shares by Speedway, these were nothing but tax-motivated sham manipulations and in actuality constituted a sale of assets by Speedway to Cassens Transport followed by a dividend distribution in the amount of $40,000 to Idol.

It is clear that Idol initiated these transactions, as respondent contends, and that tax considerations played a leading role in his decision to cast the consecutive steps here in question in the particular form adopted.

The apparent objective of the two-step transaction here involved was the acquisition of substantial funds by Edgar S. Idol to apply against his outstanding indebtedness to Security Credit Company from which he had borrowed $112,500 on February 28, 1956, for the purpose of paying his obligation to H. M. Florman, from whom he previously had purchased all the outstanding shares of Speedway stock. The minutes of a special meeting of the board of directors of the corporation held February 23, 1956, explain the reasons for undertaking the transaction:

He [Idol] said that on February 13, 1956 he had agreed to complete the deal by paying a flat price of $112,500. In order for him to finance the acquisition at this price, he stated it would be necessary to find another buyer for a portion of the stock or the corporate assets and that, after negotiations extending over several months, he had arrived at an agreement with Cassens Transport Co., to acquire the Detroit operating rights and a limited amount of equipment.

These minutes also disclose the following resolution:

RESOLVED:
1. That Edgar S. Idol, President, be and he hereby is authorized and directed to enter into an agreement on behalf of this Corporation providing for acquisition by Cassen's Transport Company, Edwardsville, Illinois, of this Company's Detroit franchise and equipment in exchange for 36 [sic] shares of this Company's common stock * * *

Since 1954, the policy of Speedway had been to acquire outright its transportation equipment rather than lease it. During 1955, 1956, and 1957, it paid more than $200,000 each year for such equipment. The sole object of the corporation in disposing of these assets was to realize cash with which to assist its sole stockholder to meet his pressing personal obligation.

Further, it is abundantly clear from the record that Cassens Transport intended only to acquire certain assets of the corporation and did so; it had no desire to invest in Speedway stock or to acquire even partial control of its operations. In this connection the report of the Interstate Commerce Commission issued March 21, 1957, noted:

Vendee would purchase the above-described operating rights of vendor and 13 trailers used in the operation exchanging therefor 36 shares of vendor's stock

which it would purchase simultaneously from vendor's sole stock holder for $45,-000. The foregoing method of effecting the sale was devised because of tax considerations and it is not intended that vendee at any time will acquire control of vendor as a result of the temporary stock ownership. Our consideration herein is on that basis, and vendee should not purchase the 36 shares of vendor's stock from Idol unless it intends to immediately relinquish them to vendor in payment for the properties covered by the instant purchase.

Not only is it plain from the evidence before us that Cassens had no interest in acquiring any of Speedway's stock, but there is no indication here that Idol had any real desire to dispose of any part of his 42 shares of the corporation's stock. The only reason the transactions were cast in the form of a sale of stock followed by a redemption was the possibility of obtaining favorable tax treatment.

It is true, as petitioners contend, that on its face the transitory registration of stock ownership in the name of Cassens followed by registration in the name of Speedway and accompanied by a shifting of stock certificates representing 32 shares from Idol to Cassens to Speedway, formally complies with the requirements of a stock redemption under section 302(b)(3) of the 1954 Code, and *looks* like a "complete redemption of all of the stock of the corporation owned by the shareholder [Cassens]." Cf. *John A. Decker*, 32 T.C. 326, affd. 286 F. 2d 427; *Ray Edenfield*, 19 T.C. 13; and *Zenz* v. *Quinlivan*, 213 F. 2d 914. The essential difficulties with this contention result from the absence of record evidence tending to indicate that Cassens not only formally but in substance became the owner, for tax purposes, of 32 shares of Speedway stock, and that the corporation actually intended to and did redeem those shares from Cassens.

Not only does the evidence before us fail to disclose that Idol really wished to dispose of any of his 42 Speedway shares or that Cassens desired to acquire them, but it also fails to indicate that Speedway had any reason or purpose to reacquire part of its outstanding shares. Petitioners have not established that Speedway had a real intention to reduce its capital or to redeem any part of its outstanding stock.

Petitioners place some reliance on our decision in *Standard Linen Service, Inc.*, 33 T.C. 1, in which the taxpayer, the owner and operator of a linen supply business, was the wholly owned subsidiary of Model Laundry Co. Model was in need of additional capital to meet its liabilities, make building repairs, and expand its drycleaning business. Because of these and other operating problems confronting Model, certain of its stockholders decided to sell all of their stock in the corporation. A prospective purchaser, Alsco, was contacted, which was interested solely in acquiring certain assets belonging to Model and the taxpayer. The stockholders of Model insisted on disposing only of their stock, and Alsco ultimately agreed to purchase 45,476 of Model's 61,795 outstanding shares subject to the understanding that it could immediately transfer the shares to Model in exchange for

its linen supply assets. Thereupon, the taxpayer, Standard Linen Service, Inc., was liquidated and its assets were distributed to Model. Alsco purchased the 45,476 shares from the stockholders of Model for $1,909,992, and immediately delivered the stock to Model in exchange for its assets valued at $1,909,992. Model retired the 45,476 shares, as well as certain shares held in its treasury, and amended its articles of incorporation to reflect a capital reduction and partial liquidation. Noting the strong evidence that the stockholders intended to and insisted upon selling their stock, the further proof of a genuine stock redemption and partial liquidation of assets by Model, the absence of any indication that Model desired to sell its assets, and the fact that the form of the transactions there in question was determined by the purposes of the parties and was consistent therewith, we there held that the formal steps taken had substance and constituted a realistic sale of stock followed by a partial liquidation of assets.

Patently, the type of evidence we found persuasive in *Standard Linen Service, Inc., supra,* is absent from the record before us, with the exception of the parallel circumstance that Cassens here like Alsco in the *Standard Linen Service* case intended to acquire and did acquire business assets. Speedway's sole purpose was to assist Idol to obtain $40,000 in cash. The preliminary negotiations contemplated the disposal by Speedway of certain of its assets to Cassens. There is no evidence of any offer or discussion concerning the disposition to Cassens of stock. As noted above, Idol has failed to show that he had any intention to part with a portion of his equity in the corporation and he remained sole stockholder of Speedway after the transactions of May 1, 1957, were completed. In view of these facts and since the form of these transactions was controlled solely by tax considerations, we are unable to hold that the formal steps on which petitioners rely are consistent with what actually took place.

In our opinion the momentary formal registration of 32 shares of Speedway stock in the name of Cassens Transport Company on May 1, 1957, was so transitory and so clearly inconsistent with the actual purposes and intentions of the parties and the ultimate results of these transactions as to be entirely lacking in substance. The purpose of Speedway was to transfer assets to Cassens and it did so; the purpose of Cassens was to acquire certain of the assets of Speedway and it did so. Thus, in effect, Cassens purchased assets from Speedway even though it momentarily received stock in order to do so. See *Commissioner* v. *Ashland Oil & R. Co.,* 99 F. 2d 588, certiorari denied 306 U.S. 661; *Kimbell-Diamond Milling Co.,* 14 T.C. 74, affd. 187 F. 2d 718; *Montana-Dakota Utilities Co.,* 25 T.C. 408. Accordingly, the $40,000 cash payment made by Cassens on May 1, 1957, realistically must be regarded as the consideration paid for the Detroit franchise

462

and 15 pieces of equipment. Since the Detroit franchise was acquired by Speedway in 1955 at a cost of $15,000 and the equipment sold to Cassens had a net book value on May 1, 1957, of $1,857.09, Speedway, as a result of the sale of these assets, realized long-term capital gain in the amount of $23,142.91.

Inasmuch as the $40,000 cash payment received by Idol constituted the consideration paid by Cassens for the assets purchased by it from Speedway, and since the distribution of this amount to him on May 1, 1957, was the result of an integrated two-step transaction personally initiated by him for the purpose of obtaining the assistance of the corporation to enable him to satisfy his own indebtedness to Security Credit Company, and since Speedway had earnings and profits sufficient to make such a distribution, which left Idol its sole stockholder (as he was before the transaction), we conclude that this payment to him constituted a distribution essentially equivalent to a dividend. *Ferro* v. *Commissioner, supra;* cf. *Genevra Heman*, 32 T.C. 479, affd. 283 F. 2d 227.

*Decisions will be entered for the respondent.*