JUSTICE STEEL, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Justice Steel, Inc. v. Commissioner
Docket Nos. 11034-77, 11035-77, 11036-77
United States Tax Court
T.C. Memo 1980-466; 1980 Tax Ct. Memo LEXIS 115; 41 T.C.M. (CCH) 209; T.C.M. (RIA) 80466; October 21, 1980, Filed *115 Individual petitioners owned all of the stock in corporate petitioner and were two of eight stockholders in another, unrelated corporation. All of the stockholders in the unrelated corporation, including individual petitioners, guaranteed performance of a lease executed by that corporation. The unrelated corporation went out of business and the lease was not honored. A suit to obtain performance of the lease was instituted, naming the individual petitioners among the defendants. A settlement of the suit was reached. The corporate petitioner paid the portion of the settlement payment owed by the individual petitioners. Held, corporate petitioner is not entitled to a business expense deduction under section 162, I.R.C. 1954, or a loss deduction under section 165, I.R.C. 1954, for the payment of a portion of the settlement; heldfurther, the payment of the settlement was a constructive dividend to the individual petitioners; Held further, the individual petitioners are entitled, under section 166(d), I.R.C. 1954, to short-term capital loss treatment of the amounts paid on their behalf in settlement of their guarantee obligations. G. Thomas Shields, for the petitioners. Charles *116 W. Kite, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: Respondent, in three separate statutory notices dated August 3, 1977, determined deficiencies in the Federal income taxes of the petitioners as follows: Docket
Taxable
Number
Petitioners
Year Ended
Deficiency
11034-77
Justice Steel, Inc.
10/31/74
$ 7,708.01
11035-77
John G. Justice and
12/31/74
2,047.22
Willie F. Justice
11036-77
Richard F. Justice and
12/3174
1,218.00
Glenda F. Justice
The issues presented for our decision are: (1) whether corporate petitioner, Justice Steel, Inc., (hereafter Justice Steel) is entitled to a deduction under section 1621a or section 165 for the payment of $16,000.00 in settlement of a dispute involving the personal guarantee by its stockholders, individual petitioners herein, of a lease contract; (2) whether the individual petitioners, [2] John G. Justice (hereafter John) and Richard F. Justice (hereafter Richard), realized income in the form of a constructive dividend in the amount of the $16,000.00 paid in settlement of the personal guarantee dispute, and (3) whether John and Richard, if they did realize income from the settlement payment, may treat as an expense under section 162, *117 as a business bad debt under section 166(a)(1), or as a nonbusiness bad debt under section 166(d), the amount paid in the settlement. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Individual petitioners, John and Richard, resided in Nashville, Tennessee, during the time in question. Each of them, with his wife, timely filed a joint Federal income tax return for 1974 with the Internal Revenue Service, Memphis, Tennessee. Petitioner Justice Steel is a Tennessee Corporation founded December 17, 1958, having its principal place of business in Nashville, Tennessee. John, who is the chairman of the board, owns 60 percent of the stock of Justice Steel and Richard, who is the president, owns the other 40 percent. Justice Steel timely filed its corporate income tax return for the fiscal *118 year ending October 31, 1974, on an accrual basis with the Internal Revenue Service Center, Memphis, Tennessee. Its principal business is the fabrication and erection of structural steel and ornamental and miscellaneous iron works. This business is obtained through competitive bidding. When necessary, portions of acquired contracts are subcontracted. Justice Steel paid John and Richard a salary plus a percentage of profits for their work as officers and directors. From 1964 through 1969, John and Richard alone or in conjunction with other persons started six other corporations. Micro-Machinery, Inc. (hereafter MMI) and the other corporations founded by John and Richard were part of a plan to bid on entire jobs as a unified group, rather than subcontracting parts of jobs to "outsider" companies or bidding on subcontracts of jobs awarded to other companies. By acquiring entire jobs through a group of corporations, all owned in some part by John and Richard, better control and co-ordination of each job was possible and a greater share of the total fee for each job was available to John and Richard. While it was alleged that more jobs may have been acquired because of the unified *119 group bidding, the profit each corporation realized on each job was not increased by the involvement of any of the other corporations in the group. During the years in question, none of the corporations, including MMI, was a subsidiary or otherwise under the direct control of Justice Steel. Specifically, Justice Steel made no agreements or resolutions directly guaranteeing any obligations of MMI or any of the other corporations. The corporations did not always work together, nor were they ever under any obligation to do so. The only link among these corporations was the common stock ownership of John and Richard. Most of the corporations in the group have ceased to operate. Yet, even though Justice Steel is no longer able to bid on the unit concept, its steady grown of profits continues. After the corporations of the group, such as MMI, ceased to operate, Justice Steel merely subcontracted portions of jobs to other corporations, losing none of its profit on the steel fabrication portion of the jobs. MMI was organized on October 25, 1968, to operate a precision machine shop, to manufacture and repair precision machines and to perform other related activities. The initial capitalization *120 of MMI was through the sale of stock for $125,000 to eight shareholders. Of those eight, John owned approximately 15 percent of the stock of MMI and Richard owned approximately 10 percent. William F. Carpenter, Jr. (hereafter Carpenter), secretary of Justice Steel, [3] was also a shareholder of MMI. Additional capital was obtained by borrowing money from First American National Bank (hereafter First American). On October 29, 1968, to facilitate their borrowing, the board of directors of Justice Steel resolved to indemnify and hold harmless the directors of Justice Steel, including John and Richard, up to $75,000, for any loss they might suffer from personally guaranteeing any obligations of MMI. This resolution was not a requirement or otherwise a part of any financial arrangement with MMI. Meanwhile, MMI purchased equipment necessary for its operations, writing checks against a $500,000 line of credit from First American. This equipment was then sold to First Leasing Corporation (hereafter *121 First Leasing), a subsidiary of First American. On February 4, 1969, First Leasing leased the equipment back to MMI. The lease was then assigned by First Leasing to First American. It was the general unwritten policy of First American to require the shareholders of a closely-held corporation to guarantee any loans or leases made by that corporation with First American. John and Richard had executed a blanket guarantee covering any transactions involving their companies and First American, and later executed specific guarantees on each obligation as it was created. One such guarantee, made on February 6, 1969, by all eight of the shareholders of MMI, including John, Richard and Carpenter, covered 50 percent of the "outstanding unpaid balance" of the equipment lease with First American. Less than a year after the lease was executed, MMI was forced by financial difficulties to sell its assets to Tritec, Inc. Tritec's purchase offer was made January 3, 1970, and the bill of sale was executed January 14. The principals of Tritec, Fred D. Wright and Stirton Oman, Jr., sought and obtained the permission of First Leasing for the sale by guaranteeing, in a "letter" dated January 5, *122 1970, the performance of the lease pursuant to the provisions of the guarantee executed by the shareholders of MMI. Subsequent to the sale of the assets of MMI to Tritec, both corporations failed. In a letter dated November 1, 1972, from First American, Tritec was advised that it was in default of the lease it had assumed and was asked to pay the amount due. First American also requested payment from the shareholders of MMI, who had guaranteed the lease initially. In an attempt to force the guarantors of MMI to pay the obligation, Wright and Oman, the Principals of Tritec, filed suit against First American and seven of the eight shareholders of MMI, including John, Richard and Carpenter, to obtain a declaratory judgment in the matter. This lawsuit was ended by a settlement among the parties and by the subsequent entry of a final order by the court on December 20, 1974. Pursuant to the settlement, John and Richard agreed to pay $16,000 to First American. The amount paid by Carpenter for the settlement was not revealed. At a special meeting on September 2, 1974, of the Justice Steel board of directors, the October 29, 1968, decision by Justice Steel to hold harmless and indemnify *123 its directors for any loss they might suffer from personal guarantees of MMI obligations was reaffirmed and expanded to included "similar ventures." Although John and Richard had incurred liability on another MMI obligation in the past which was not paid by Justice Steel, Justice Steel did accrue within its taxable year ended October 31, 1974, and paid by check on November 25, 1974, the $16,000 in settlement of the dispute involving the guarantee by John and Richard of MMI obligations. Justice Steel took an itemized deduction for the payment on its income tax return for its taxable year ending October 31, 1974. Similar reimbursements of or payments for the benefit of Carpenter or any of the other shareholders of MMI who agreed to settlement payments were not made by Justice Steel. Respondent disallowed the entire $16,000 deduction claimed by Justice Steel. It is his determination that the payment was neither ordinary nor necessary as required under section 162, and that it did not constitute a bad debt deduction under section 166, since Justice Steel had no obligation to First American as a result of the lease default, nor any rights against John and Richard as a result of the payment. *124 Instead, it is the respondent's position that the payment was a constructive dividend to John and Richard, who are entitled to a nonbusiness bad debt deduction under section 166(d) for the settlement payment made on their behalf. To the contrary, petitioners contend that Justice Steel was obligated to indemnify John and Richard for their guarantee liability and thus should be allowed a deduction under either section 162 or section 165. It then follows, say petitioners, that payment of this obligation is not a dividend. In the alternative, should we deny Justice Steel's deduction and find the payment to be dividend income to John and Richard, petitioners argue that John and Richard are entitled to a business bad debt deduction under section 166(a)(1) in the amount of payment. OPINION 1. Deduction by Justice Steel
First, we must decide whether Justice Steel may deduct the $16,000 payment made in settlement of the lease default. The primary argument of petitioners is that the payment is deductible under section 162, which allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on a trade or business. "Ordinary and necessary" business expenses are *125 those noncapital expenditures which are closely related to the taxpayer's business and which are appropriate and helpful for the development of that business. Commissioner v. Tellier, 383 U.S. 687 (1966); Welch v. Helvering, 290 U.S. 111 (1933). Under the facts presented, we fail to see how the payment qualifies. Paying the portion of the lease controversy settlement owed by John and Richard, as guarantors of MMI, was not for the benefit of Justice Steel's business. MMI was not irreplaceable as a supplier of materials or as a customer, nor was MMI a subsidiary of Justice Steel. Further, Justice Steel's business or credit requtation was not threatened by the default and demise of MMI. Cf. Milbank v. Commissioner, 51 T.C. 805 (1969). MMI was a separate business entity only distantly related to Justice Steel by common shareholders, John and Richard, who were attempting to create a group of corporations for bidding on construction projects as a unit. Implementation of this unit bidding concept was for the benefit of John and Richard, more than for the benefit of the corporations of the group. While the profit of John and Richard for each job would increase for each corporation of *126 the group participating in that job, the profit from that job for each corporation, including Justice Steel, was unaffected by the participation of any of the other corporations of the group. This is exemplified by the fact that Justice Steel's profits have increased steadily during the time before, during and after the unit bidding attempt, while most of the other corporations of the group have ceased to exist. Therefore, supporting John and Richard in their promotion of the unit bidding concept was not within the scope of Justice Steel's business. [4] *127 It is well settled that the business and investments of the stockholders of employees are not necessarily those of the corporation. Burnet v. Clark, 287 U.S. 410 (1932); Dalton v. Bowers,287 U.S. 404 (1932). The payment was not a deductible expense. In the alternative, petitioner argues that the payment was a loss incurred in a transaction entered into for profit deductible under section 165. A loss involves the involuntary and unintentional parting with something of value. Giurlani & Bro. v. Commissioner, 119 F. 2d 852 (C.A. 9, 1941). Payment of another's debt, voluntarily and not from any legal obligation, is not a loss subject to the provisions of section 165. [5] *128 Putnam v. Commissioner, 352 U.S. 82 (1956); Commissioner v. Gilt Edge Textile Corp.,173 F. 2d 801 (C.A. 3, 1949), affirming 9 T.C. 543 (1947); Reading Co. v. Commissioner, 132 F. 2d 306 (C.A. 3, 1942), certiorari denied 318 U.S. 778 (1943); W. F. Young, Inc. v. Commissioner,120 F. 2d 159 (C.A. 1, 1941); Giurlani & Bro. v. Commissioner,supra.
Justice Steel was not obligated under Tennessee law to John, Richard, or First American to make the settlement payment. Petitioners' reliance on Cunningham v. Metropolitan Government,476 SW 2d 641 (Tenn. 1972) is grossly misplaced. Cunningham involves a statute (T.C.A. § 6-640) which requires that municipalities and other political subdivisions of Tennessee indemnify their workers against any judgment for damages arising out of the performance of official duties. The instant situation is in no way affected by that statute or the case which interprets it. First, Justice Steel is not a political subdivision of Tennessee. Further, although the resolution of the board of directors of Justice Steel stated an intent to "indemnify" its directors against any loss suffered as a result of their guarantees of MMI's obligations, a true indemnity agreement was not created. Instead, the resolution was a gratuitous statement of intent, made without legal obligation, and fulfilled only once, and even then on a voluntary basis (see note 4, supra). Such *129 a voluntary payment is not a loss deductible under section 165. 2. Constructive Dividend . Section 61(a) defines gross income to include dividends, which, in turn, are described by section 316(a) as any distribution of property made by a corporation to its shareholders. Discernible as early as Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), the concept of constructive dividends increased the potential for such dividend income. The law, as subsequently developed, which is applicable in determining the existence of a constructive dividend was aptly summarized by Circuit Judge Simpson in United States v. Smith, 418 F. 2d 589, 593 (C.A. 5, 1969): The crucial concept in finding a constructive dividend is that the corporation conferred an economic benefit on the stockholder without expectation of repayment. See Gibbs v. Tomlinson, 5 Cir. 1966, 362 F. 2d 394; Paramount-Richards Theatres v. Commissioner of Internal Revenue, 5 Cir. 1946, 153 F. 2d 602; Sachs v. Commissioner of Internal Revenue, 8 Cir. 1960, 277 F. 2d 879; Hash v. Commissioner of Internal Revenue, 4 Cir. 1959, 273 F. 2d 248. These cases make it clear that the "economic benefit" test is controlling in spite of *130 the fact that the distribution may not be recorded on the corporate books as a dividend. The motive or expressed intent of the corporation is not solely determinative, and constructive dividends may be found contrary to the expressed intent of the corporation.See Gibbs v. Tomlinson, supra.Additionally, it is well settled that corporate payments in discharge of a shareholder-taxpayer's personal debts and liabilities are in the nature of constructive dividends. See Gibbs v. Tomlinson,supra;Sachs v. Commissioner of Internal Revenue, supra; Hash v. Commissioner of Internal Revenue, supra.
[Footnote omitted.] Settlement of the guarantee obligation of John and Richard was obtained by the payment of $16,000 by Justice Steel to First American. There is no evidence that any of the involved parties ever expected John and Richard to repay Justice Steel for the economic benefit which they had received. Therefore, John and Richard realized a constructive dividend of $9,600 and $6,400, respectively, upon the satisfaction of their obligations by Justice Steel. See also, Wortham Machinery Co. v. United States, 521 F. 2d 160 (C.A. 10, 1975); McLemore v. Commissioner, 494 F. 2d 1350 (C.A. 6, 1974), *131 affirming a Memorandum Opinion of this Court. [6] Making the payment directly to First American, rather than to John and Richard, makes it no less a dividend. Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Idol v. Commissioner, 38 T.C. 444 (1962), affd. 319 F. 2d 647 (C.A. 8, 1963). 3. Bad Debt Deduction.
Petitioners next contend that any amounts found as constructive dividends to John and Richard are offset by equal deductions under section 165(c)(2) for losses incurred in a transaction entered into for profit. However, the payment on behalf of John and Richard was in settlement of their obligation as guarantors of MMI, which had since ceased to exist.As clearly stated in Putnam v. Commissioner, supra, at 85, 88: The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness *132 of a debt.* * * the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all. [Footnote omitted.] Even though the payment on their behalf was only a portion of the total settlement, John and Richard suffered a bad debt loss. Cf. Martin v. Commissioner, 52 T.C. 140 (1969), affd. per curiam 424 F. 2d 1368 (C.A. 9), certiorari denied 400 U.S. 902 (1970). Unlike the situations in Santa Anita Consolidated, Inc. v. Commissioner, 50 T.C. 536 (1968), and Shea v. Commissioner, 36 T.C. 577 (1961), affd. per curiam 327 F. 2d 1002 (C.A. 5, 1964), the payment in the instant case was to satisfy John and Richard's guarantee obligation, not to gain a release from the guarantee before any obligation arose. Therefore, section 165(c)(2) is inapplicable here. If John and Richard are entitled to any deduction for the payment, it must be provided by section 166. Section 166(a) provides for the deduction of any debt which becomes worthless in the taxable year. In the case of individuals, section 166(d) supersedes section 166(a) to the point that a nonbusiness bad debt will be treated *133 as a shortterm capital loss. A nonbusiness bad debt is defined in section 166(d)(2) as one other than (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessenss of which is incurred in the taxpayer's trade or business. While Putnam limited treatment of guarantee payments to section 166, they are not automatically to be considered nonbusiness bad debts. Section 1.166-8(b), Income Tax Regs.; Roussel v. Commissioner, 37 T.C. 235 (1961); Cowden v. Commissioner, 34 T.C. 819 (1960). If satisfaction of the guarantee is proximately related to the business of the taxpayers, John and Richard, then it may be fully deductible under section 166(a). Section 1.166-5(b), Income Tax Reg.; Cowden v. Commissioner,supra.To qualify the debt under section 166(a), John and Richard must show that their dominant motivation in making the guarantee was the protection of their business and not their investment. United States v. Generes, 405 U.S. 93 (1972). The question of whether a debt is incurred in a trade or business is a question of fact, Higgins v. Commissioner, 312 U.S. 212 (1941); Giblin v. Commissioner, 227 F. 2d 692 *134 (5 Cir., 1955), on which petitioner bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
Devoting one's time and energies to the business of a corporation, without more, is not a trade or a business. Whipple v. Commissioner, 373 U.S. 193 (1963). Being an employee can be a taxpayer's trade or business. Gould v. Commissioner, 64 T.C. 132 (1975); Primuth v. Commissioner, 54 T.C. 374 (1970). However, John and Richard do not claim that their guarantee was motivated by employment with MMI. Promoting, organizing, financing and selling businesses can be a taxpayer's trade or business, as well. Giblin v. Commissioner, supra; cf. Whipple v. Commissioner, supra.However, John and Richard do not claim that they were in the trade or businss of promoting and organizing corporations. Further, the record does not indicate that John and Richard ever received compensation or fees as promoters or organizers beyond a normal return on their investment. Whipple v. Commissioner, supra; Deely v. Commissioner, 73 T.C. 1081 (1980); Millsap v. Commissioner, 46 T.C. 751 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968). Instead, John and Richard were motivated by the prospect *135 of increased total profits per job as owners of the various corporations in the bidding group. They sought to increase the value of their investment in MMI. This is not a trade or business. United States v. Generes, supra; Whipple v. Commissioner, supra; Higgins v. Commissioner, supra.John and Richard are limited to nonbusiness bad debt treatment of the settlement payment made on their behalf. To reflect the foregoing, Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: John G. Justice and Willie F. Justice, docket No. 11035-77; and Richard F. Justice and Glenda F. Justice, docket No. 11036-77.↩
1a. All statutoy references are to the Internal Revenue Code of 1954, as in effect during the year in question, unless otherwise noted. ↩
2. The wives of John and Richard, Willie and Glenda, respectively, are parties only by virtue of having filed joint returns with their husbands.↩
3. Carpenter was an incorporator of Justice Steel and served as secretary of the corporation during the year in question. Whether he served as a director of Justice Steel was not mentioned at trial.↩
4. Apparently, the value of the bidding group to the business of Justice Steel was similarly discounted during the time in question, since the payment for John and Richard relative to MMI was the only one made by Justice Steel. Additional support was not given to any of the other corporations of the group or any of the shareholders of those corporations. Even certain other obligations of MMI which were met by John and Richard were not paid by Justice Steel.
5. Nor will a voluntary payment of another's debt qualify as a bad debt under section 166. A bona fide debt is required. Income Tax Reg. § 1.166-1(c); Wortham Machinery Co. v. United States, 521 F. 2d 160 (C.A. 10, 1975); Zimmerman v. United States, 318 F. 2d 611 (C.A. 9, 1963). Voluntary payment without obligation or expectation of repayment fails to establish the requisite debt. E.g., Putnam v. Commissioner, 352 U.S. 82 (1956); Delta Plastics Corp. v. Commissioner, 54 T.C. 1287↩ (1970).
6. T.C. Memo 1973-59↩.