WILLIAM L. MARCY AND SARAH C. MARCY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marcy v. Commissioner
Docket No. 27712-91
United States Tax Court
T.C. Memo 1994-534; 1994 Tax Ct. Memo LEXIS 541; 68 T.C.M. (CCH) 1028; October 24, 1994, Filed *541 Decision will be entered under Rule 155. For petitioners: G. Harris Adams. For respondent: Randall L. Preheim. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 13,613 income tax deficiency for petitioners' 1987 taxable year. Respondent also determined a $ 681 addition to tax under section 6653(a)(1)(A)[1] and a $ 3,403 addition to tax under section 6661. To the extent negligence is found under section 6653(a)(1)(A), 50 percent of the interest on the underpayment would also be due under section 6653(a)(1)(B). After concessions of the parties, the following issues remain for our consideration: (1) Whether petitioners' partnership was engaged in an activity not for profit within the meaning of section 183; (2) whether petitioners are entitled to deductions claimed for the activity under section 174; (3) whether petitioners received dividends in the total amount of $ 14,976.31 from their corporation; and (4) whether petitioners are liable for additions to tax under sections 6653(a) and 6661. *542 FINDINGS OF FACT [2]
Petitioners resided in Littleton, Colorado, at the time their petition was filed. Petitioner [3]William L. Marcy is an engineer, with master's degrees in aeronautics and mechanical engineering. He has worked in the aeronautical and aerospace research field since 1952, including research in high-speed airplanes, hypersonic transport vehicles, and atmospheric reentry vehicles. He worked as an employee of Lockheed Corp., McDonnell Douglas Corp., and Martin Marietta Corp. until his retirement at age 57 in 1986. During April 1986, petitioners formed Marcy Analytics Corp. (Corporation), which became a subcontractor of Martin Marietta Corp. Corporation's shares were held 76 percent by Mr. Marcy and 24 percent by Mrs. Marcy. Mr. Marcy continued to perform work for Martin Marietta Corp. as an employee of his own corporation. Corporation reported gross receipts from Mr. Marcy's consulting for the taxable years ended *543 March 31, 1987, 1988, 1989, and the calendar years ended December 31, 1989 and 1990, in the amounts of $ 38,837, $ 23,391, $ 59,707, $ 58,787, and $ 80,379, respectively. Mr. Marcy, as a consultant, worked on a number of turbocharger systems for small aircraft, including a Cessna 210, a Cessna 182, and a Piper Aztec. He was also involved in the installation of larger engines in place of stock equipment in smaller aircraft. During the period 1975 through 1980, Mr. Marcy prepared individual and small business income tax returns for about 40 customers per year. During that period, he spent several weeks at tax preparation classes and about three classes for information updating annually. During 1981, petitioners formed a limited partnership named "Marcy Analytics" (Partnership). Mr. Marcy owned 76 percent of Partnership, and Mrs. Marcy owned the remaining 24 percent. Some of the original purposes of Partnership were to provide income tax consultation and preparation *544 services and to develop, manufacture, and sell aircraft modification kits. Books and records were maintained for Corporation and Partnership. A certified public accountant has been used for Corporation since 1987. During 1977, Mr. Marcy purchased a 1947 Navion aircraft (Navion) for $ 10,700. During 1979, Mr. Marcy, because of some consulting work he was doing, conceived the idea of modifying the Navion engine. The Navion was built during the period 1946 to 1952 and is a four-passenger, single-engine, all-metal, low-wing airplane. It was built with about a 185-horsepower engine that attained 205 horsepower for takeoff and about a 135-mile-per-hour cruising speed. The total number of registered Navions in the United States was 1,319, of which 996 were of similar specifications to Mr. Marcy's Navion. Because the Navion is no longer manufactured, Mr. Marcy decided to improve its performance by turbocharging the engine. Mr. Marcy has also owned three different Aronca planes, including a 1947 model. In 1980, Mr. Marcy believed that he could produce a turbocharger for Navions at a cost of about $ 1,800. Later, he believed the cost would range from $ 2,500 to $ 3,500. In 1980, *545 Mr. Marcy estimated a selling price for the turbocharger ranging from $ 5,000 to $ 8,000. At the time of trial, Mr. Marcy believed that his Navion had a value ranging from $ 16,000 to $ 20,000. During 1979, Mr. Marcy attended "fly-ins" where Navion owners flew their planes and convened. Mr. Marcy is a member of the American Navion Society, to which about one-half of Navion owners belong. During 1979, Mr. Marcy purchased a Navion engine for about $ 5,000, installed it, and flew his Navion with the acquired engine during 1980. Initially, he thought it would take about 2 or 3 years to develop the turbocharged engine. During the period 1979 through the year in issue, Mr. Marcy worked on his Navion and its modifications, including the technical and mechanical aspects of the manifold, cooling system, valve guides, pistons, and turbocharger housing. He spent about 8 to 12 hours weekly involved with his Navion. Mr. Marcy used his Navion regularly to travel to various locations and events connected with flying, especially events connected with other Navion aircraft. In order to generally fly his Navion with a turbocharged engine or to sell turbocharged engines to others, Mr. Marcy *546 would be required to obtain Federal Aviation Administration (FAA) approval and certification. During 1980, FAA approval was sought for the turbocharge modification and for the installation of the modified engine in Mr. Marcy's Navion. FAA approval for these certifications was not received by Mr. Marcy. In connection with obtaining an experimental airworthiness certificate for research and development, Mr. Marcy communicated with the FAA during the period 1982 through 1985. Mr. Marcy attained experimental status, but did not submit drawings or other specifications that were requested by the FAA, and, ultimately, during 1985, the FAA returned all of the submissions to Mr. Marcy. Later in 1985, an experimental airworthiness certificate was obtained from the FAA for purposes of sales demonstrations. That certificate would not permit major modification of the Navion or sale of a turbocharger to the general public. Under that certificate, however, Mr. Marcy was permitted to fly his Navion to air shows and fly-ins in the United States. During February 1988, the FAA advised Mr. Marcy that his applications for the supplemental certifications had been inactive and that his project was *547 canceled. The applications were returned to Mr. Marcy. Partnership, in which the Navion turbocharger activity and other activities were conducted, reported the following income and (losses) for the years 1981 through 1991: Year
Income or (Loss)
1981
($ 12,204)
1982
(17,202)
1983
(17,866)
1984
(24,185)
1985
(21,754)
1986
5,566 1987
(22,910)
1988
(20,870)
1989
(19,116)
1990
(31,484)
1991
(19,536)
Neither Partnership nor Mr. Marcy realized any revenue or income from the turbocharging activity. In addition to the Navion activity, Partnership's books reflected ownership of 1947 Buick and 1962 Ford convertible automobiles and a 1947 Ford pickup truck. Mr. Marcy, at one time, had intended to fix up the 1947 Buick and pickup truck and cause all of his means of transportation to be of 1947 vintage. Mr. Marcy had purchased the 1947 Buick and several older model aircraft, other than the Navion, with the intent of fixing them up to their original condition, but these projects did not materialize. The names of all registered Navion owners in the United States were available during the years in question, but Mr. Marcy did not obtain these names. Although some Navion *548 owners were canvassed, no market study or analysis was performed to determine the general potential for turbocharger sales. Kit Marcy (Kit) is Mr. Marcy's son and Mrs. Marcy's stepson. Kit approached his father for loans during 1986 through 1988. Corporation's records reflect the following cash disbursements to Kit during those years: Date
Amount
Oct. 1986
$ 1,000
Nov. 1986
1,000
Dec. 1986
850
Jan. 1987
500
Mar. 1987
460
Apr. 1987
1,000
May 1987
1,251
July 1987
300
Nov. 1987
100
May 1988
160
June 1988
900
Sept. 1988
250
Oct. 1988
50
Nov. 1988
160
Jan. 1989
180
Mar. 1989
450
Apr. 1989
300
Oct. 1989
300
Kit did not sign any promissory notes or provide any collateral in connection with the above disbursements from Corporation. Mr. Marcy was aware during 1988 that Kit was experiencing financial difficulties. The records of Corporation reflect payments received on behalf of Kit in the amounts of $ 320, $ 160, and $ 510 for February 1988, May 1988, and August 1988, respectively. From April 1986 through November 1988, Corporation's records reflect the following cash disbursements to Partnership: Date
Amount Apr. 1986
$ 39.23
May 1986
398.33
June 1986
774.95
July 1986
400.00
Aug. 1986
200.00
Sept. 1986
1,150.00
Oct. 1986
892.00
Nov. 1986
2,500.00
Dec. 1986
5,150.00
Feb. 1987
2,907.00
Mar. 1987
309.17
Apr. 1987
925.53
May 1987
937.74
June 1987
1,692.70
July 1987
1,919.04
Oct. 1987
1,190.72
Dec. 1987
1,483.61
Jan. 1988
603.96
Feb. 1988
62.48
Mar. 1988
179.64
June 1988
6,439.50
July 1988
1,516.31
Aug. 1988
11,986.26
Sept. 1988
4,915.45
Nov. 1988
19.85
*549 No promissory notes were executed, and no portion of the cash disbursements was repaid to Corporation by Partnership. For the years 1990 and 1991, Partnership's tax return balance sheets showed more liabilities than assets. Corporation did not report interest income from Partnership or Kit. Corporation has never paid dividends to petitioners or a salary to Mr. Marcy for the consulting he performed. For the taxable year 1987, petitioners reported $ 50,948 of salary from Martin Marietta, $ 14,132 of pension annuity, and interest, dividends, and tax refunds totaling $ 1,470. From that income, petitioners claimed almost $ 33,000 in losses from Partnership, which included the expenses claimed in connection with the turbocharger activity. The individual and Partnership tax returns for the tax period under consideration were prepared by Mr. Marcy. The corporate return was prepared by Roger Nittler, a certified public accountant. Mr. Nittler did not do any work for Corporation until 1987, and was not involved in setting up the entities or their activities. The original corporate return, signed in July 1987, for the tax year ended March 31, 1987, did not reflect any loans to Partnership *550 or to Mr. Marcy's son. The amended return for the same period, signed December 1989, reflected the payments to Partnership and Mr. Marcy's son as loans receivable. The original and amended returns reflected loans to shareholders of $ 1,963 and $ 2,084, respectively. Mr. Nittler advised petitioners that, with respect to loans being reflected on Corporation's return, section 7872 required that interest be picked up as income but that Corporation would not have to report any more than $ 5 actually paid because Corporation was on the cash basis, and no more than $ 5 had been reported paid by Mr. Marcy. OPINION Petitioners' Turbocharger Activity
The controversy here concerns whether petitioners' activity was not engaged in for profit. Section 183(a) provides that individual taxpayers will not be allowed deductions which are attributable to an "activity * * * not engaged in for profit". This term of art is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business expenses] or under paragraph (1) or (2) of section 212 [expenses incurred for the production of income]." Section *551 183(b) permits deductions for expenses related to an activity not engaged in for profit, but only to the extent of any gross income generated from the activity in excess of any deductions otherwise allowable. Petitioner also argues that his turbocharger activity was a research and development activity which should be judged under the standards of section 174, rather than sections 183 and 162. Section 174, like section 162, has a trade or business requirement, and we must consider and decide whether petitioner was in, or was likely to enter, a trade or business and/or profit-making activity. Green v. Commissioner, 83 T.C. 667, 686-687 (1984). In order to make that determination, we have followed the section 183 guides or categories to assist in our inquiry. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Keanini v. Commissioner, 94 T.C. 41 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without *552 opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In determining whether an activity is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case. Sec. 1.183-2(a), Income Tax Regs. The regulations set forth nine criteria normally considered for this purpose. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets *553 used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.
The parties have addressed this issue by reference to the nine factors set forth in section 1.183-2(b), Income Tax Regs. For convenience, we follow the parties' format. Initially, we review Mr. Marcy's background and the circumstances surrounding his reporting of losses from the activity. Mr. Marcy is a highly trained and experienced engineer and is well qualified to be involved in the design and possibly the manufacture of turbochargers for aircraft. His entire career has been in the aeronautical field. He has worked for some well-known manufacturers of aeronautical products, and as he approached his retirement from full-time employment, he considered alternative and additional means of revenue. Significantly, he continued to work as a consultant, albeit through *554 a corporate business entity, to Martin Marietta Corp. Following his 1986 retirement, Mr. Marcy continued to earn consulting fees, but the fees were received by and remained in Corporation because no salary was paid to Mr. Marcy or dividends paid to petitioners, the sole shareholders. In addition to the consulting for his former employer, Mr. Marcy earned other fees in lesser amounts from consulting jobs. In the context of those jobs, some of which involved the turbocharging of small aircraft, Mr. Marcy conceived the idea of developing turbocharging kits to sell for a profit. We do not question Mr. Marcy's initial intent to develop the turbocharger for the purpose of making a profit. We must decide whether he carried through on his idea with a profit-making motive. (1) The manner in which the taxpayer carries on the activity -- Mr. Marcy was technically well qualified to pursue the turbocharger activity. He intended to build a kit which he could market to Navion owners for $ 5,000 to $ 8,000. Initially, he thought that his cost would be about $ 1,800, and later his estimate ranged from $ 2,500 to $ 3,500. Apparently these estimates were based upon Mr. Marcy's own judgment, *555 because no evidence was offered as to the source of the cost estimates. Further and more importantly, no meaningful market survey was conducted at any point in the development of the turbocharger. Although Mr. Marcy made inquiries of some Navion owners at fly-ins and air shows, he had no information about the overall market and potential for his intended product. The names and locations of all registered owners of Navions in the United States were available to Mr. Marcy. In this connection, of the 1,319 registered Navion owners, about 996 of them owned the variety that could represent a potential customer. Considering that, up to the time of trial, petitioner had claimed expenditures exceeding $ 200,000 on the turbocharger activity, it is surprising that he did not canvass the known local universe of about 1,000 Navion owners. As respondent points out on brief, that could have been accomplished for the cost of postage (i.e., $ 290), envelopes, and the photocopying of a survey document. As a matter of economic viability and considering the facts advanced yet not necessarily proven by petitioner, he would be required to manufacture and sell somewhere between 36 and 133 kits merely *556 to break even. [4] We must also consider, however, that petitioner had purchased his Navion for $ 10,700 in 1977. Even if the price or value of Navions increased or doubled over the period under consideration, $ 5,000 to $ 8,000 would be a relatively large expenditure to increase the horsepower or cruising speed at higher elevations. Based on petitioner's testimony, it appears that the Navions were being flown by owners as vintage or antique aircraft. That being the case, there would be a tendency for Navion owners to restore them to their original condition, which would not have included the turbocharger proposed by petitioner. Petitioner's testimony illustrates that point in that he restored a 1947 pickup truck to its original condition, including the motor. *557 We also note that for the 11 years reflected in the record, losses claimed through Partnership, with the exception of 1 year, averaged about $ 20,000 per year. No revenue was received in connection with the Navion turbocharger activity, and petitioner has not shown any efforts to abandon unprofitable methods or the need to expend the amounts he did over that period of time. Additionally, petitioner was not approved or certified by the FAA to generally use a turbocharged engine in his Navion or to sell turbochargers to others. Mr. Marcy's dealings with the FAA were sporadic and unsuccessful as they related to approval for selling the turbocharger. He was only authorized to operate his Navion and the turbocharged prototype engine on a limited basis. At one point in 1988, the application process for broader approval was canceled by the FAA, and Mr. Marcy's papers were returned to him. (2) The expertise of the taxpayer or his advisers -- As we have already noted, Mr. Marcy had the expertise to design and/or build a prototype of the intended product, but his expertise in marketing and market potential was not evident from the record. Additionally, there is no indication that *558 he sought that type of expertise from another. (3) The time and effort expended by the taxpayer in carrying on the activity -- Due to Mr. Marcy's extensive travel schedule for his full-time position (about 80 percent of the time), the amount of time he could devote to developing and/or selling the turbocharger was necessarily limited. In this regard, Mr. Marcy's time was limited to about 8 to 12 hours per week. Included in that time would be the time Mr. Marcy spent to attend fly-ins and air shows. Although it may be hard to judge whether a person could successfully develop a turbocharger for marketing by working 8 to 12 hours per week, it is more relevant to note that the claimed expenditures and the time consumed include the expense and time of flying to various air shows and fly-ins when no product was available for sale. (4) The expectation that assets used in the activity may appreciate in value -- Mr. Marcy testified that the value of his Navion at the time of trial (September 1993) was about $ 16,000 to $ 20,000. Considering that he purchased it for $ 10,700 and replaced the engine for $ 5,000, it is difficult to envision that Mr. Marcy was intending to make a *559 profit from appreciation of the Navion. Certainly, we cannot reach any conclusions helpful to petitioners when comparing the $ 200,000 of claimed losses to any potential the Navion may have had to appreciate. (5) The success of the taxpayer in carrying on other similar or dissimilar activities -- Mr. Marcy has been successful as a technical consultant or employee of various large and small aeronautical employers and clients. This, of course, accounts for his technical capability to attempt the development of a turbocharger for his Navion. He had limited sales or marketing expertise in connection with his consulting activity, but that is different from the operation of a manufacturing and/or product sales business. We do not find this category to be helpful or harmful to petitioners' case. (6) The taxpayer's history of income or losses with respect to the activity, and (7) the amount of occasional profits, if any, which are earned -- The turbocharger activity generated no income and caused losses averaging about $ 20,000 annually in all but 1 out of 11 years. Under Supreme Court precedent regarding section 174, discussed infra, there is no need to have a salable *560 product and, hence, income during the current tax year. Nonetheless, we find that the sustained period of losses, without an exhibited attempt to minimize them, reflects poorly on Mr. Marcy's intent or potential to make a profit. (8) The financial status of the taxpayer -- Petitioners received a steady stream of income against which to offset the claimed losses from the turbocharger activity. For 1987, they received over $ 65,000 of income and claimed about $ 33,000 of losses from the activity. Additionally, their corporation reported gross receipts from Mr. Marcy's consulting for the taxable years ended March 31, 1987, 1988, 1989, and the calendar years ended December 31, 1989 and 1990, in the amounts of $ 38,837, $ 23,391, $ 59,707, $ 58,787, and $ 80,379, respectively. Petitioner also received a steady stream of pension income. Some portion of this income was being offset by expenses incurred by Mr. Marcy, occasionally accompanied by Mrs. Marcy, in flying to air shows, fly-ins, and other locations in their 1947 Navion aircraft. (9) The presence of elements of personal pleasure or recreation -- Mr. Marcy obviously enjoyed working on and flying his Navion and being *561 involved in flying-related activities. No matter how petitioner has characterized his attendance at the various air shows and related types of events, the obvious purpose of those events is the entertainment and personal pleasure of the participants. The record here reflects that Mr. Marcy's involvement with his Navion aircraft was primarily and substantially for his pleasure and enjoyment. This is clearly a hobby of Mr. Marcy's, and it fits in with his pattern of collecting vintage automobiles and airplanes. He went so far as attempting to collect a series of 1947 machines, including a pickup truck, automobile, and the Navion. The pickup truck was restored to its original specifications, including its engine. Mr. Marcy fancied the idea that he could drive to his 1947 Navion in his 1947 Buick. In addition, he had purchased several older aircraft in varying states of disrepair for the purpose of renovation. This activity clearly constituted Mr. Marcy's hobby. Mr. Marcy's extensive aeronautical engineering background permitted him to experiment and to tinker with his Navion and other aircraft. His intent to market turbochargers was little more than a dream that his hobby might *562 also provide him with supplemental income during his retirement. Concerning petitioners' contention that the claimed losses constitute research and development expenditures, our analysis results in our holding that the activity was not a trade or business and lacked the potential to become one. The failure to sell turbochargers during the taxable years under consideration is a point about which differences exist regarding the thresholds for deductibility for sections 162 and 174. Under section 174, the Supreme Court has held that research and development costs may be deductible, even though there was no product for sale in the year(s) the deductions were claimed. Snow v. Commissioner, 416 U.S. 500 (1974). Section 174(a)(1) allows a taxpayer to currently deduct research and experimental expenditures paid or incurred in connection with the taxpayer's trade or business. Research and experimental expenditures are defined in section 1.174-2(a)(1), Income Tax Regs., in pertinent part, as follows: expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory *563 sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property * * *. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions. * * *
In this case, however, the expenses were not incurred in connection with a trade or business of petitioner. The turbocharger activity was not a trade or business, but instead a hobby or avocation. Section 174, like section 162, contains a trade or business requirement, and we must consider and decide whether petitioner was in, or was likely to enter, a trade or business and/or profit-making activity. Overall, we find that the turbocharger activity was one not engaged in for profit and/or was not a trade or business within the meaning of sections 183, 162, and 174. Corporate Dividends -- $ 14,976.31
Respondent determined that petitioners received constructive dividends from Corporation in the amount of $ 18,884 during their 1987 taxable year. *564 That amount comprised a $ 768 life insurance premium paid on petitioners' policies by Corporation, $ 2,055 of travel reimbursement, $ 3,611 of payments to Mr. Marcy's son, and $ 12,450 of payments from Corporation to Partnership. The portion relating to the insurance premiums and travel reimbursement has been settled by the parties. Respondent concedes that the payments from Corporation to Partnership totaled $ 11,365.31, which amount, along with the $ 3,611 paid to Mr. Marcy's son, is still in controversy. Petitioners bear the burden of proof on these issues. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Concerning the $ 3,611 paid to Mr. Marcy's son, the parties focus on whether Mr. Marcy was financially capable of individually lending the funds to his son and on the son's financial condition. Those considerations underlie the ultimate question of whether these funds were being advanced to Mr. Marcy's son for the personal benefit of Mr. Marcy. It is obvious to us that these payments were made by Corporation to Mr. Marcy's son only because of the family relationship and not because of a legitimate purpose of the corporate business that *565 served as the business entity through which Mr. Marcy performed consulting services for Martin Marietta and other potential customers. Moreover, Mr. Marcy was aware of his son's financial difficulties, which made repayment more remote and less likely. It was stated that the advances were for the son's education and that repayment was not to occur until after he finished college and attained a paying position. Petitioners did not declare dividends, and Mr. Marcy, the sole source of the corporate revenue, was not paid a salary. In this setting, we find that petitioners simply caused their corporation to pay money to Mr. Marcy's son, which constitutes a constructive dividend to petitioners. In form, these payments to Mr. Marcy's son may have been reflected on the corporate records as loans; yet, in substance, these payments were nothing more than distributions for petitioners' benefit to Mr. Marcy's son. Thus, we hold the $ 3,611 to be a taxable dividend to petitioners for 1987. Idol v. Commissioner, 319 F.2d 647, 651-653 (8th Cir. 1963), and cases cited therein, affg. 38 T.C. 444 (1962). Next, we consider the cash payments, *566 made almost on a monthly basis, from Corporation to Partnership. We first note that petitioners are the sole shareholders of Corporation and the sole partners or owners of Partnership. They hold their interest in those entities in parallel 76/24-percent ratios. No promissory notes were executed, and no part of the cash disbursements were repaid to Corporation by Partnership. Corporation did not report interest income from Partnership. These factors alone raise substantial suspicion about the true nature of these payments and their characterization as loans by petitioners. Taking into account the lack of dividends, coupled with the failure to pay Mr. Marcy a salary, and considering the activity in Partnership, including the collection of old vehicles and airplanes for the benefit of the shareholder(s)/partner(s), we conclude that the payments constitute taxable dividends to petitioners in the amount of $ 11,365.31. See, e.g., Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 638-641 (11th Cir. 1984), and cases cited therein, affg. T.C. Memo. 1982-314. Petitioners argue, alternatively, that the amounts paid *567 from Corporation to Partnership were not dividends, but instead were travel reimbursements for consulting purposes while using the Navion. The record in this case does not support such a factual finding, and we reject petitioners' speculative alternative position. Additions to Tax Under Sections 6653(a) and 6661
Respondent determined that petitioners are liable for additions to tax under sections 6653(a)(1)(A) and (B) and 6661. Section 6653(a)(1)(A) provides for a 5-percent addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) provides for an addition to tax in an amount equal to 50 percent of the interest due on that portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The Commissioner's determination of negligence is presumed to be correct, and the taxpayer has the burden of proving that the determination is erroneous. *568 Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Petitioners argue that their reliance upon their certified public accountant, Mr. Nittler, should relieve them of being liable for the negligence addition. Respondent contends that the reliance argument is of less consequence in this case. This is so because we should recognize that Mr. Marcy was a knowledgeable taxpayer, in that he had been trained to and did prepare Federal income tax returns for others and for himself. Additionally, respondent points out that Mr. Marcy set up all of the entities and the related activities without the assistance of Mr. Nittler and that Mr. Nittler did not prepare petitioners' individual or partnership returns. Additionally, we understand Mr. Nittler's testimony to be that there should be interest on the reported loans. We do not understand that Mr. Nittler verified or certified that the reported amounts were in fact loans or that he advised petitioners to structure the payments as loans. We understand Mr. Nittler to have advised petitioners, in retrospect, to report the payments as loans on an amended return. We have found that petitioners used *569 the partnership entity to channel corporate funds that otherwise would have been taxable if passed through them. In that regard, the partnership entity, for the most part, encapsulates Mr. Marcy's personal hobby activities. Additionally, use of corporate funds for personal purposes of an owner's child was also found in this case. These findings, coupled with the relatively large amounts claimed as losses, cause us to hold that petitioners are liable for the additions to tax under section 6653(a)(1)(A) and (B). We do not find sufficient reliance, lack of knowledge on the part of Mr. Marcy regarding the reasonableness for reliance, or involvement by the accountant with respect to any portion of the resulting deficiency in income tax, to render the negligence additions inapplicable. Finally, we consider whether petitioners are liable for an addition to tax under section 6661. That section provides that, if there is a substantial understatement of tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). *570 There is a substantial understatement of income tax if the amount of the underpayment for the year exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year or (2) $ 5,000. Sec. 6661(b)(1). In the absence of a tax shelter, section 6661(b)(2)(B) provides for a reduction of the understatement if: (1) The taxpayer's position is supported by substantial authority or (2) the taxpayer had adequately disclosed all the relevant facts pertaining to the item that caused the understatement. Here, again, petitioners argue that they have substantial authority for the treatment as reported based upon the advice of their certified public accountant. For the reasons expressed in this opinion, petitioners did not have substantial authority for their positions with respect to the loss issue or the dividend issues. Petitioners also argue that respondent abused her discretion because she should have waived the section 6661 addition under section 6661(c). That section provides that the Secretary may waive any or all parts of the addition "on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that *571 the taxpayer acted in good faith." Petitioners refer us to section 1.6661-6, Income Tax Regs., and argue that, in light of Mr. Marcy's experience, knowledge, and education, and because he relied upon the advice of his certified public accountant, respondent abused her discretion. First, we note that the regulation relied upon by petitioners states that "Reliance on * * * the advice of a professional (such as an * * * accountant) would not necessarily constitute a showing of reasonable cause and good faith." Sec. 1.6661-6(b), Income Tax Regs. The regulation goes on to provide that reliance on an accountant would constitute good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.
All of the activities, transactions, and entities here were "engineered" by petitioner prior to Mr. Nittler's involvement sometime in 1987. Mr. Nittler became involved with only a limited aspect of petitioners' tax reporting, and it is unclear what role he played in the financial and tax planning for the various entities. We do know that Mr. Marcy is knowledgeable about tax matters and was trained in tax return preparation. We also know that *572 Mr. Marcy prepared his own returns and those of Partnership which involved the claimed losses. We also know that the payments were characterized as loans to Partnership and Mr. Marcy's son as an afterthought in an amended return, and that the original return did not report the purported loans to Partnership or Mr. Marcy's son. Also considering the designated "borrowers" of the purported loans, and Corporation's failure to declare dividends, we are unable to find much support for petitioners' argument that it was reasonable for them to rely on their accountant. Accordingly, we do not find that petitioners have shown substantial authority or cause for waiver. Therefore, if the understatement exceeds the 10-percent or $ 5,000 threshold of section 6661(b)(1), the addition to tax under that section is applicable to the entire underpayment. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties' stipulation of facts and exhibits are incorporated by this reference.↩
3. References to petitioner are to Mr. Marcy.↩
4. Maximum selling price ($ 8,000) less minimum cost ($ 2,500) equals maximum profit per unit ($ 5,500) divided into $ 200,000 equals 36. Minimum selling price ($ 5,000) less maximum cost ($ 3,500) equals minimum profit per unit ($ 1,500) divided into $ 200,000 equals 133. It should be noted that marketing and sales costs have not been considered in these computations, nor have costs for years after 1991.↩